IN THE MATTER OF JOHN J. DRISCOLL.

Suffolk. April 4, 1991. - July 17, 1991.

Present: LIACOS, C J , WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ

*Attorney at Law*, Disciplinary proceeding, Commingling of funds, Suspension, Censure. *Fiduciary*.

An attorney who violated Supreme Judicial Court Rule 3:07, Canon 9, DR 9-102B (3) and (4), and Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), and (6), in that he commingled clients' funds with those of his own and used such funds to pay his personal and office expenses, with no intent permanently to deprive the clients of their funds and no actual deprivation, was to receive the public censure of this court. [698-701] GREANEY, J., dissenting, with whom WILKINS and ABRAMS, JJ., joined, was of opinion that the attorney should be suspended from the practice of law.

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on October 1, 1990.

The case was reported by *Wilkins*, J.

*Arnold R. Rosenfeld*, Bar Counsel.

*Charles B. Swartwood, III (John J. Driscoll* with him) for the respondent.

LYNCH, J. This bar discipline case is before the court on a reservation and report by a single justice. The Board of Bar Overseers (board) unanimously recommended that we impose a public censure on the attorney for his commingling and use of clients' funds. Bar Counsel, however, urges a three-year suspension.

Based on a hearing and a stipulation, a hearing committee of the board found the following facts. The attorney, John J. Driscoll (respondent), was admitted to the Massachusetts Bar in 1968. After representing the sellers at a real estate closing on July 7, 1987, the respondent deposited the pro-

ceeds of the sale in a clients' funds account. Starting in August, 1987, the balance in the account frequently fell below the amount due the sellers. The respondent disbursed the bulk of the payments due the sellers in October, 1987. These checks cleared as a result of a deposit in September, 1987, of a check in the amount of $6,000. After the disbursements in October, the amount in the account was frequently below the sum needed to cover the last payment to the sellers, and was in overdraft on several occasions. The last payment to the sellers was made on January 27, 1988.[1]

In September, 1987, the respondent received from another client a check in the amount of $6,000, as a deposit on real estate that she was purchasing. The respondent was obligated to hold this sum in escrow pending the completion of the sale. The respondent deposited this sum into his clients' funds account, and used it to pay office and personal expenses, including the October disbursements to the sellers discussed above. By the middle of October, 1987, the balance in the account had been reduced to $32.96. On October 23, 1987, the respondent deposited in the clients' funds account a check in the amount of $6,000, which represented a fee due the respondent from a different client. As a result of this deposit, the checks issued by the respondent in connection with the closing were funded, and the real estate sale was consummated.

In February, 1988, the respondent deposited into his clients' funds account a check from two other clients in the amount of $36,500, which represented a deposit on the sale of a house they were purchasing. The closing took place on July 28, 1988. In the interim between the deposit of this check and the closing, the balance in the clients' funds ac-

---

[1]The respondent testified that the sellers became entitled to receive the last payment in the amount of $5,000 in November, 1987, after the respondent himself paid to have trash removed from the property which the sellers had agreed to remove as a condition of the sale. The respondent did not make the payment until January 27, at which time, he testified, he also paid $250 in interest. These were the only clients who experienced any delay in receiving the funds due them.

count was frequently below the amount needed to fund the deposit on the sale, and at one point fell as low as $186.17. The respondent used the funds to pay personal and office expenses. Checks issued by the respondent at the closing in July were funded in part by a deposit into the clients' funds account of a $37,500 personal bank loan made to the respondent.[2]

The hearing committee concluded that the respondent violated S.J.C. Rule 3:07, Canon 9, DR 9-102 (B) (3) and (4), as amended, 406 Mass. 1301 (1990), and S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5) and (6), as appearing in 382 Mass. 769 (1981). The committee noted as mitigating factors that the respondent "never intended to harm his clients nor permanently deprive them of their property," that he "has made full restitution to all clients," and that he "has shown remorse and has acknowledged derelictions and has fully and openly cooperated with Bar Counsel and at the hearing." The committee also noted that the respondent "was under emotional strain and suffered from moderate depression during relevant times and has taken steps to correct same" including receiving counseling. Finally, the committee noted that the respondent has never been the subject of any other Bar complaint, that his "personal and professional reputation . . . has been otherwise excellent" with a professional reputation for being "meticulous and competent in his areas of practice," and that the respondent "was inexperienced and

---

[2]At his hearing, in response to a question by Bar Counsel, the respondent volunteered that in 1989, after the investigation by Bar Counsel had commenced, he again used money from a deposit on a sale of real estate that he was obligated to keep in escrow, and closed that sale with funds representing a deposit on a sale for different clients. He then replaced those funds before the closing by borrowing money from a friend. Bar Counsel claimed the findings of fact should be revised to reflect as an aggravating factor this continued misappropriation of clients' funds after the commencement of Bar Counsel's investigation. An appeal panel of the board, however, stated that "[w]hile this information could have been considered as a factor in aggravation, it does not require this Panel to revise the [Hearing] Committee's Findings of Fact, Conclusions of Law and Recommendation for Public Censure."

untrained in office administration and unaware of good accounting procedure."[3]

Based on the evidence from the hearing and the stipulation of agreed facts, the committee unanimously concurred that "but for the case law by which we are bound, a recommendation of private censure would have been reached." However, in order to adhere to this court's decision in *Matter of the Discipline of an Attorney*, 392 Mass. 827 (1984) (the "*Three Attorneys*" case), the committee recommended public censure. Bar Counsel appealed from the committee's report and recommendation, arguing that the appropriate discipline for the respondent is a three-year suspension from the practice of law. The appeal panel adopted the committee's report and recommended filing an information with this court. The board accepted the appeal panel's recommendation that the respondent be publicly censured. Bar Counsel maintained his earlier position, and a single justice of this court reserved and reported the case to the full court. We agree with the board that the appropriate discipline in this case is a public censure.

In *Three Attorneys, supra* at 835-836, the board and Bar Counsel urged the adoption of standard sanctions for the commingling and use of clients' funds. Bar Counsel proposed

---

[3]There was evidence of the following circumstances: Prior to embarking on a solo practice in 1985, the respondent had worked in private law firms since his admission to the bar, where he had never been involved in collecting fees from clients or attracting clients. In his solo practice, the respondent was not receiving as many clients as he had anticipated and was experiencing financial difficulties. Due to moderate depression, fear of losing clients, and his inexperience in collecting fees, the respondent had difficulty in aggressively pressing for payment of fees owed him. His practice was never to request retainers in advance, but to wait until his work was finished before billing a client. He was owed several thousands of dollars in fees at the relevant time. When he used the clients' funds, he was expecting fees to come in soon.

As a result of seeking professional counseling and enlisting his wife's support, the respondent now makes a practice of asking for retainers up front. He has closed his "trustee account" and in the future plans to put clients' funds in an IOLTA account. As of January, 1990, the respondent has given up his rented office and has been operating out of his home. The respondent also teaches paralegal students at a junior college.

that, in addition to imposing public discipline in all such cases, a standard sanction of suspension ought to be imposed whenever an attorney intentionally uses clients' funds, with no intent permanently to deprive the client, and no actual deprivation. *Id.* at 836. While we stated that an offending attorney, in any case where the misconduct occurred after the date of that opinion, would have a heavy burden to demonstrate that the sanctions recommended there by the board and Bar Counsel should not be imposed, we specifically declined to adopt mandatory sanctions in such cases. Instead, we held that "[e]ach case must be decided on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Id.* at 837.

Furthermore, our review of disciplinary decisions should promote even-handed results, and ensure that the disposition imposed is not markedly disparate from the dispositions imposed in similar cases. *Matter of Alter*, 389 Mass. 153, 156 (1983). In every case cited by Bar Counsel where suspension has been imposed for conduct occurring after *Three Attorneys* involving commingling and use of clients' funds with no intent permanently to deprive, there was other improper conduct on the part of the attorneys in addition to the commingling, which made their behavior more egregious than in the instant case. In *Matter of Cardia*, Supreme Judicial Court for Suffolk County No. 90-48BD (December 31, 1990), a single justice imposed a two-year suspension where, in addition to the misappropriation and commingling of clients' funds without intent permanently to deprive, and the use of one client's funds to purchase an interest in real estate for herself, the attorney's conduct involved a continuing pattern of misrepresentations, failure to perform legal duties, failure to advise clients of the status of their cases, and failure properly to defend, making the attorney "a threat to her clients' interests."

In *Matter of Martin*, 5 Mass. Att'y Discipline Rep. 238 (1988), a two-year suspension was imposed where, in addition to the commingling and use of clients' funds with no

intent permanently to deprive, the attorney's conduct included failure to file a will in Probate Court or to appoint the executor as directed by the will, making a false statement to Bar Counsel about the location of missing funds, and failure to cooperate with Bar Counsel.

In *Matter of Callahan*, 5 Mass. Att'y Discipline Rep. 49 (1988), a two-year suspension was imposed where the attorney's other conduct included misrepresentation to a client, delay of a closing and failure adequately to protect a client's interest in property, failure to notify the insurer of a client's tort settlement or to satisfy the insurer's resulting lien on the settlement in violation of the attorney's statutory obligation, and failure to notify the client about the statutory lien on his settlement or to pay the lien for over three years despite his promise to do so.

In *Matter of Elliott*, Supreme Judicial Court for Suffolk County No. 90-3BD (February 23, 1990), a single justice imposed a three-month suspension where the attorney's other conduct included misrepresentation, participation in a fraudulent transfer, neglect of a legal matter, failure to withdraw his appearances on behalf of clients when so requested after discharge, holding a case file and clients' funds ransom for payment of his fee, and failure to pay any interest in restitution or to appreciate the need to do so.[4]

Similarly, cases cited by Bar Counsel imposing an indefinite suspension also involved more egregious conduct than that of the attorney in this case. In *Matter of Worthen*, Supreme Judicial Court for Suffolk County No. 90-2BD (March 1, 1990), the attorney's conduct, in addition to conversion of a client's bail funds to his own use, included failure to notify the client that he had obtained a refund of his bail money, intent temporarily to deprive the client of his funds, misrepresentation about the location and availability of the funds, and failure to repay the funds for over three

---

[4]The single justice noted that the commingling and use of clients' funds occurred primarily before *Three Attorneys*.

years despite repeated requests and after agreement to do so on several occasions.

In *Matter of Ridge*, Supreme Judicial Court for Suffolk County No. 89-39BD (January 16, 1990), the attorney, who was indefinitely suspended, had used the tax abatement proceeds of two separate clients for personal and business expenses. In addition, he had failed, in both cases, to notify those clients that he had received the tax abatement proceeds. In one case, he reimbursed the client only after the client had discovered his receipt of the proceeds, had made repeated formal demands for payment, had filed a civil suit, and had filed a complaint with the board. In the other case, he did not make restitution until eleven months later. The attorney had earlier been temporarily suspended for a different offense[5] in which he had forged the endorsement of his client on a $10,000 check, had misrepresented to his clients the status of their claim, had used the funds from the check for personal and business expenses, and had failed to deliver to his clients any portion of the $10,000.[6]

Finally, in *Matter of Bukauskas*, Supreme Judicial Court for Suffolk County No. 89-13BD (May 18, 1990), the attorney, who was indefinitely suspended, was deemed to pose a "threat of substantial harm to her clients" after she not only misappropriated funds that came into her possession from a client's estate and failed to reimburse those funds, but also neglected a legal matter, was held in contempt of Probate Court for failing to appear and to produce a will despite her earlier arrest for that reason, and failed to cooperate with Bar Counsel.

---

[5]The offense for which he was temporarily suspended occurred after the offenses for which he was later indefinitely suspended.

[6]The single justice noted that the fact that disbarment was not recommended may have been explained by factors in the relevant time period such as a decrease in the attorney's business, unusual medical expenses for his children, his burdensome mortgage obligations and evidence of alcohol abuse.

In March, 1991, the attorney was found in contempt of the order for temporary suspension and the order for indefinite suspension.

Bar Counsel cites all the above-mentioned cases as examples of cases similar to the respondent's, where the attorneys were disciplined by suspension, even when arguably greater mitigating factors existed in their cases than in the instant case. But the instant case differs in that here, there has been no misrepresentation or dishonesty; no indication that the respondent was other than meticulous and diligent in other aspects of his representation of the clients involved; cooperation with Bar Counsel has been notable; and little, if any, harm has been suffered by the clients.

To deprive the respondent, a sole practitioner, of his livelihood by suspending him, as Bar Counsel recommends, would be too severe a discipline in light of the respondent's circumstances and in comparing his offenses with those for which other attorneys have been suspended. By reaching this conclusion, we do not mean to detract from the seriousness of the respondent's violations. Nevertheless, for the reasons discussed above, we direct that a judgment be entered ordering public censure of the respondent.

*So ordered.*

GREANEY, J. (dissenting with whom Wilkins and Abrams, JJ., join). The court's decision that a public censure is appropriate discipline for the attorney in this case is wrong. In *Matter of the Discipline of an Attorney* (the *"Three Attorneys"* case), 392 Mass. 827 (1984), we made clear the considerations that would apply to a lawyer's misuse of clients' funds. We said the following (392 Mass. at 835-837):

> "The Board of Bar Overseers has placed in the record of those proceedings a statement of policy which it urges in these and similar cases. It is the settled position of the Board that public discipline is always merited in a case of a lawyer who has commingled clients' funds and the lawyer's funds and who has then used the commingled funds for his or her own purposes. It is implied

in the Board's statement that, in any such case where it is shown, additionally, that there is 'wrongful intent,' suspension and disbarment from the practice of law is appropriate, with the extent of the sanction dependent upon the extent of the exacerbating facts . . . .

"Bar counsel states a position consistent with that of the Board, but he states it even more definitively. He urges that 'standard' sanctions should be adopted as follows:

"Intentional commingling of clients' funds with those of an attorney should be disciplined by private reprimand. Unintentional, careless use of clients' funds should be disciplined by public censure.

"Intentional use of clients' funds, with no intent to permanently or temporarily deprive the client, and no actual deprivation, should be punished by a term of suspension of appropriate length.

"Intentional use, with intent to deprive or with actual deprivation, should be disciplined by disbarment or indefinite suspension.

"The views of the court may be stated succinctly. We concur generally in the Board's and Bar Counsel's statements of principles . . . We do not adopt a posture of mandatory sanctions in such cases, but we do state that an offending attorney, in any case where the misconduct occurs after the date of this opinion, will have a heavy burden to demonstrate to the court that sanctions as recommended here by the Board and Bar Counsel should not be imposed."

The attorney in this case knowingly and intentionally misappropriated clients' funds (without an intent to steal) in an amount that exceeded $36,000. He did so long after our pronouncement in the *Three Attorneys* case. His conduct clearly falls within the category of conduct described above that calls for "a term of suspension of appropriate length."

The mitigating circumstances cited by the attorney should not change the prescribed sanction. Those circumstances are

invariably present in one fashion or another in many cases. We have said that the absence of prior misconduct "carries little or no weight," *Matter of Pike*, 408 Mass. 740, 745 (1990), and, surely, it is unconvincing to argue that the seriousness of respondent's action should be palliated by the facts that he may have been under some emotional strain and was inexperienced in office administration. As has been noted, the attorney intentionally used large sums of his client's money to pay personal and business expenses hoping that his defalcations would not be detected until he had covered his tracks. A plea of "strain" and "inexperience" is a weak response to a duty of strict honesty which is a most basic principle of proper law practice.

That the sanction of suspension will be imposed on a solo practitioner in the attorney's circumstances also is of no consequence. We cannot sensibly have or apply a rule which excuses solo practitioners from warranted discipline while imposing the same discipline on others who happen to be engaged in group practice. The *Three Attorneys* case involved solo practitioners, and its message about future misconduct of the type that occurred here makes no differentiation based on the nature of the offending lawyer's practice. There is good reason for all of this.

> "Like many rules governing the behavior of lawyers, [the rule governing client funds] has its roots in the confidence and trust which clients place in their attorneys. Having sought his advice and relying on his expertise, the client entrusts the lawyer with the transaction — including the handling of the client's funds. Whether it be a real estate closing, the establishment of a trust, the purchase of a business, the investment of funds, the receipt of proceeds of litigation, or any one of a multitude of other situations, it is commonplace that the work of lawyers involves possession of their clients' funds. That possession is sometimes expedient, occasionally simply customary, but usually essential. Whatever the need may be for the lawyer's handling of clients'

money, the client permits it because he trusts the lawyer.

"It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers." *Matter of Wilson*, 81 N.J. 451, 454 (1979).

In this case, there is an admitted pattern of intentional conduct involving misuse of client funds. Rather than attempting to distinguish, in an unconvincing way, several single justice decisions (all of which follow, and are consistent with, the principles of the *Three Attorneys* case), the court should look only to that decision. Individual Justice's opinions are not suitable precedent when there exists an opinion of the full court that speaks fully to the matter and was intended to lay it to rest. This court has an obligation to maintain confidence in the bar and consistency in matters of bar discipline. The *Three Attorneys* case fostered these goals in the awareness that "[i]f public confidence is destroyed, the bench and bar will be crippled institutions." *Matter of Wilson, supra* at 461. The court has unnecessarily undermined the clear standards of the *Three Attorneys* case, and, in the process, has diminished the court's credibility in an area where the public interest requires steadfast protection of clients' rights. For the serious misconduct proved, the attorney should be suspended from the practice of law.